

**SIGNED this 08th day of September, 2014.**

<br>

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**
_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 97-54148-CAG |
| | § | |
| JAMES CHARLES PAPPAS, | § | CHAPTER 7 |
| | § | |
|     Debtor | § | |
| | § | |

| | | |
|---|---|---|
| JAMES CHARLES CORLETTA, | § | |
| F/K/A JAMES CHARLES PAPPAS, | § | |
| | § | |
|     Plaintiff, | § | |
| | § | ADV. NO. 14-05016-CAG |
| v. | § | |
| | § | |
| THE TEXAS HIGHER EDUCATION | § | |
| COORDINATING BOARD, | § | |
| | § | |
|     Defendant. | § | |

### MEMORANDUM OPINION AND ORDER GRANTING
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Came on for consideration the above-numbered adversary proceeding and, in particular,

Defendant The Texas Higher Education Coordinating Board's ("THECB" or "Defendant")

Motion for Summary Judgment filed April 15, 2014 (the "Motion") (ECF No. 5). Plaintiff[1] filed a Response in opposition to the Motion on May 6, 2014 (the "Response") (ECF No. 17). The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I) (determination of dischargeability of a debt). Venue is proper under 28 U.S.C. §§ 1408(1) and 1409(a). For the reasons stated in this Memorandum Opinion and Order, the Court is of the opinion that Defendant's Motion for Summary Judgment should be GRANTED.

### FACTUAL AND PROCEDURAL BACKGROUND

The following uncontroverted facts are taken from Plaintiff's Complaint filed in the above-referenced adversary proceeding (ECF No. 1). Plaintiff filed a Chapter 7 petition for relief on or about August 12, 1997. (Cmplt.[2] at ¶ 21). Plaintiff included in his Schedule "F" (Creditors Holding Nonpriority Claims) a debt designated as "Hinson-Hazlewood College Access Loan" owed to "Texas Higher Education" in the amount of $18,193.56 (the "CAL debt"). (Cmplt. at ¶ 25). Schedule "F" further indicates that the CAL debt was not listed as disputed, contingent, or unmatured and that Joan Durbin was the borrower of the loans in 1993 and 1994. (Cmplt. at ¶ 25). Ms. Durbin is not now, and never has been, related to the Plaintiff. (Cmplt. at ¶ 26).

On August 15, 1997, the Court issued an "Order Combined With Notice of Commencement of Case Under Chapter 7 of the Bankruptcy Code, Meeting of Creditors, and the Fixing of Dates" establishing November 18, 1997, as the deadline to file a Complaint Objecting to Discharge of the Debtor or to Determine Dischargeability of Certain Debts. (Cmplt. at ¶ 27). Plaintiff's Chapter 7 case was a "no asset" case meaning there were no non-exempt assets

---

[1] Plaintiff changed his last name from Pappas to Corletta after he received his Chapter 7 discharge.

[2] "Cmplt." denotes Plaintiff's Complaint filed in the adversary proceeding (ECF No. 1).

available for the Chapter 7 trustee to liquidate for distribution of the proceeds to creditors. Nonetheless, THECB filed an unsecured nonpriority proof of claim based on Plaintiff's guaranty for the CAL debt in the amount of $18,383.66. THECB's proof of claim contained the following statement: "Since guaranteed student loans are not dischargeable except as provided for under Title 11 U.S.C. 523(a)(8), we ask that you determine the dischargeability of this debt." The THECB proof of claim contained two attachments consisting of the loan applications co-signed by the Plaintiff. (Cmplt. at ¶ 28).[3]

Plaintiff nor the THECB filed a complaint to determine the dischargeability of the CAL debt under § 523(a)(8).[4] No party in interest objected to THECB's proof of claim. On September 19, 1997, the Chapter 7 trustee filed his no asset report. (Cmplt. at ¶ 30). On December 8, 1997, Plaintiff received his Chapter 7 discharge. (Cmplt. at ¶ 30).

Thereafter in 2011, THECB initiated a collection action against Plaintiff in Texas state court based upon Plaintiff's guaranty of the CAL debt. Plaintiff asserts as a defense to THECB's pending state court lawsuit that the CAL debt he guaranteed was discharged in his prior Chapter 7 case. As a result, Plaintiff moved to reopen his Chapter 7 bankruptcy case to file this adversary proceeding asserting that the CAL debt had been discharged in his Chapter 7 case. The state court action has been abated pending this Court's determination of whether Plaintiff's obligation on the CAL debt was discharged.

## PARTIES' CONTENTIONS

In his Complaint, Plaintiff seeks a declaratory judgment under 28 U.S.C. § 2201 that: (1) at the time Plaintiff filed bankruptcy in 1997, § 523(a)(8) permitted discharge of Plaintiff's

---

[3] Plaintiff asserts in the related state court action that the signatures on the loan applications are not his. Plaintiff has stipulated for this adversary proceeding only that the signatures on the loan application are his.

[4] Unless otherwise noted, all references are to Title 11, U.S.C. *et seq.*

guaranty of the CAL debt; and (2) the CAL debt was actually discharged in Plaintiff's Chapter 7 bankruptcy.  Plaintiff also requests this Court find the THECB willfully violated the discharge injunction provision of § 524(a)(2) issued in Plaintiff's Chapter 7 bankruptcy and hold the THECB in contempt of Court.  The operative facts regarding Plaintiff's liability for the CAL debt are not in dispute.  The origination and source of the funding for the CAL debt and application of § 523(a)(8), as it existed in 1997, are in dispute.

After Plaintiff received his Chapter 7 discharge in 1997, he disputes much of what has transpired between the parties since discharge.  To begin, Plaintiff asserts that, from 1997 to 2011, he was unaware that THECB claimed he was liable under the guaranty on the CAL debt for the unpaid student loan obligations of Ms. Durbin.  (Cmplt. at ¶ 34).  He further asserts that THECB did not send him any written communications regarding his liability and that THECB did not attempt to collect on the student loan debt.  (Cmplt. at ¶ 34).  This assertion is contradicted by Exhibit 2 to THECB's Motion, the Affidavit of Cheryl Belleson, Office of the Texas Attorney General, who serves as the Manager of Student Loan Collections.  Ms. Belleson avers that collection actions were initiated against Plaintiff during the time frame of 1997 to 2011 and she attaches copies of letters that were purportedly sent to Plaintiff regarding the CAL debt.  (THECB Ex.[5] 2).

Plaintiff further asserts that on or about November 21, 2011, THECB recorded an abstract of judgment against Ms. Durbin as borrower on the CAL debt, and thereafter, Ms. Durbin entered into a repayment agreement with THECB and began making payments to THECB.  (Cmplt. at ¶ 37).  THECB denies that Ms. Durbin has made any payments pursuant to

---

[5] "THECB Ex." denotes Defendant THECB's summary judgment evidence attached as exhibits to THECB's Motion for Summary Judgment (ECF No. 5).

the repayment agreement.  (Answer[6] at ¶ 37).  In the state court action, THECB asserts that Plaintiff owes the principal amount of $13,086.00 on the unpaid CAL debt, plus accrued interest, costs, post-judgment interest, and attorney's fees.  (Answer at ¶ 36).

DISCUSSION

## I.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Federal Rule of Bankruptcy Procedure 7056 applies Rule 56(c) of the Federal Rules of Civil Procedure to adversary proceedings.  If summary judgment is appropriate, the Court may resolve the case as a matter of law.  *Celotex Corp.*, 477 U.S. at 323; *Blackwell v. Barton*, 34 F.3d 298, 301 (5th Cir. 1994).  The Fifth Circuit has stated "[t]he standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon evidence before the court."  *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

To the extent that the non-moving party asserts the existence of factual disputes, the evidence offered by the non-moving party to support those factual contentions must be of sufficient quality so that a rational fact finder might, at trial, find in favor of the non-moving party.  *Matsushita*, 475 U.S. at 585–87 (non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) ("adverse party's response . . . must set forth specific facts showing that

---

[6] "Answer" denotes Defendant THECB's Answer filed in the adversary proceeding (ECF No. 4).

there is a genuine issue for trial").  If the record "taken as a whole, could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial."  *LeMaire v. Louisiana*, 480 F.3d 383, 390 (5th Cir. 2007).  In determining whether a genuine issue of material fact exists, the non-moving party must respond to a proper motion for summary judgment with specific facts demonstrating that such genuine issue exists.  A genuine issue of material fact is not raised by mere conclusory allegations or bald assertions unsupported by specific facts.  *Leon Chocron Publcidad Y Editoria, S.A. v. Jymm Swaggart Ministries*, 990 F.2d 1253 (5th Cir. 1993).

## II.     The State of Texas Student Loan Programs

THECB provided competent summary judgment evidence regarding the State of Texas's loan programs; how the State implements and funds its student loans programs; who has the statutory authority to originate loans and the sources of student loan funding; why the Plaintiff is liable under the operative loan documents; and the requisite statutory authority regarding the State's collection actions.  THECB's summary judgment evidence included supporting affidavits and exhibits with appropriate citation to statutory, regulatory, and legal authority.  Plaintiff filed a number of objections to the THECB's summary judgment evidence arguing that the THECB's summary judgment evidence was deficient; there were genuine issues of material fact regarding the status of § 523(a)(8) in 1997 as it relates to Plaintiff's loan guarantees; and that the Plaintiff should be granted a continuance to conduct further discovery because the THECB has failed to produce documents incident to an earlier discovery request in state court. *See* Fed. R. Civ. P. 56(d).  The Court finds these assertions unavailing and without merit.

The THECB is an agency of the State of Texas that supervises and administers the Hinson-Hazlewood College Student Loan Program.  *See* Tex. Educ. Code Ann. §§ 52.01 *et seq.*,

61.021 (West 2006); 19 Tex. Admin. Code §§ 21.51 – 21.64 (2003). Additionally, the Office of the Attorney General ("OAG") is authorized to represent state agencies, not private institutions or parties. Tex. Const. art. IV, § 22 (West 2007). The Texas Constitution enables the state legislature (the "Legislature") to authorize the THECB to issue and sell general obligation bonds of the State of Texas to fund programs for loans to Texas residents who attend public or private higher education institutions in Texas. Tex. Const. art. III, § 50b – 50b-7 (West 2007). The Legislature authorizes amounts in general obligation bonds. Tex. Const. art. III, § 50b – 50b-7 (West 2007); s*ee also* Tex. Educ. Code Ann. §§ 52.01 *et seq.* (West 2006); Tex. Gov't Code §§ 1207 *et seq.*, 1307 *et seq.* (West 2000).

General obligation bonds create debt that is legally secured by a constitutional pledge of the first monies coming into the State Treasury, not constitutionally dedicated for another purpose, and must be approved by both houses of legislature and a majority of the voters. (THECB Ex. 3A - *Financing Mechanism*). *See* Tex. Const. art. III, § 50b – 50b-7 (West 2007); s*ee also* Tex. Educ. Code Ann. §§ 52.01 *et seq.*, 61.021 (West 2006); Tex. Gov't Code §§ 1207 *et seq.*, 1307 *et seq.* (West 2000).

Revenue bonds create debt that is legally secured by a specific revenue source(s) and do not require voter approval. *See* Tex. Const. art. III, § 50b – 50b-7 (West 2007); s*ee also* Tex. Educ. Code Ann. §§ 52.01 *et seq.* (West 2006); Tex. Gov't Code §§ 1207 *et seq.*, 1307 *et seq.* (West 2000). Under constitutional and legislative authority, THECB issues Texas College Student Loan Bonds to provide funds for the College Access Loan (CAL) Program. (THECB Ex. 1 at ¶ 4). Tex. Const. art. III, § 50b3 – 50b-7; 19 Tex. Admin. Code § 21.51-21.64 (2014); s*ee also* Tex. Educ. Code Ann. §§ 52.01 *et seq.* (West 2006); Tex. Gov't Code §§ 1207 *et seq.*, 1307 *et seq.* (West 2000). Educational loans issued through the CAL Program may be funded

through various designated funds. For example, the Texas Opportunity Plan Fund was created by the Texas Constitution, Article III, section 50b; the Revenue Bond Fund ("RBF") is a student loan revenue bond fund authorized by Chapter 56, Subchapter H of the Texas Education Code; and the Student Loan Auxiliary Fund ("SLAF") is authorized by Chapter 52, Subchapter F of the Texas Education Code. (THECB Ex. 4). *See* 19 Tex. Admin. Code § 21.53 (Supp. 1993-94).

The proceeds from the sales of bonds are deposited into dedicated funds in compliance with the Texas Education Code, Texas Government Code, and any THECB resolutions. (THECB Ex. 1 at ¶ 5). *See* Tex. Educ. Code Ann. § 52.01 *et seq.* (West 2006). The Legislature created specific guidelines for the accounting of the dedicated funds from the bond proceeds. After the bonds have been sold, bond proceeds are deposited with the Comptroller of Public Accounts ("CPA") and are credited to the appropriate fund. From there, College Access Loans ("CAL") are originated by THECB staff out of the fund via a loan management system. Loan repayments are credited to a student's individual account in the loan management system, and the funds deposited to the Interest and Sinking Fund are used to repay the bonds issued. (THECB Ex. 1 at ¶ 7.12). *See, e.g.*, Tex. Educ. Code Ann. § 52.541 (West 2006).

As part of its internal accounting procedures, THECB links the Promissory Notes evidencing student loans it made with proceeds from bonds to the designated fund as directed by the THECB resolution that authorized the issuance of the bonds. (THECB Ex. 1 at ¶ 8). *See* Tex. Educ. Code Ann. § 52.20 (West 2006). As part of this accounting system, when THECB issues a student loan from a particular fund, that loan is tracked by an account number ("PCA") linking it to the particular bond series that generated the proceeds to fund that loan. (THECB Ex. 1 at ¶ 9).

In 1991, the proceeds of bond issues Texas College Student Loan Senior Lien Revenue Bonds Series 1991 ($72,988,561.35) and Texas College Student Loan Junior Lien Revenue Bonds Series 1991 ($2,000,000) ("Series 1991 Revenue Bonds") were deposited into the RBF. Loans made from this fund were designated by PCA #25177. (THECB Exs. 1 at ¶ 11 & 1A-*Official Statement*). The State of Texas $100,000,000 College Student Loan Bonds, Series 1992 (the "Series 1992 Bonds") are general obligations of the State of Texas and are issued by the THECB under the authority of the Constitution and laws of the State of Texas, in particular Chapter 52 of the Texas Education Code, as amended, and Chapters 1207 and 1371 of the Texas Government Code, as amended. Proceeds from the sale of Series 1992 Bonds were deposited into the SLAF and have PCA #26826. (THECB Exs. 1 at ¶ 12 & 1B-*Official Statement*).

The State of Texas $75,000,000 College Student Loan Bonds, Series 1993 (the "Series 1993 Bonds") are general obligations of the State of Texas and are issued by the THECB under the authority of the Constitution and laws of the State of Texas, in particular Chapter 52 of the Texas Education Code, as amended, and Chapters 1207 and 1371 of the Texas Government Code, as amended. Proceeds from the sale of Series 1993 Bonds were deposited into the SLAF and have PCA #28059. (THECB Exs. 1 at ¶ 13 & 1C-*Official Statement*). The State of Texas $75,000,000 College Student Loan Bonds, Series 1994 (the "Series 1994 Bonds") are general obligations of the State of Texas and are issued by the THECB under the authority of the Constitution and laws of the State of Texas, in particular Chapter 52 of the Texas Education Code, as amended, and Chapters 1207 and 1371 of the Texas Government Code, as amended. Proceeds from the sale of Series 1994 Bonds were deposited into the SLAF and have PCA #28061. (THECB Exs. 1 at ¶ 14 & 1D-*Official Statement*).

As part of the THECB's account management system, each borrower's account includes information that tracks, *inter alia*, the student loan, the PCA associated with that loan, the co-signer information, and repayment information. (THECB Ex. 1 at ¶ 10). A co-signer of a note under the Hinson-Hazlewood College Student Loan Program "is jointly and severally responsible for all promissory notes signed by the maker and himself[.]" 19 Tex. Admin. Code § 21.53 (Supp. 1993-94). A co-signer may, but is not required to be, a relative. (THECB Ex. 4). *See id.* (emphasis supplied).

## III.  **Factual Background of Plaintiff's Obligations under the Student Loan Guaranty**

In 1993 and 1994, Plaintiff co-signed three CAL Program Promissory Notes as a guarantor for three of four student loans made by the THECB through the Hinson-Hazlewood College Student Loan Program to borrower Joan Durbin (the "Borrower") to fund her education. (THECB Exs. 2 at ¶¶ 4, 6b-d; 2A; 2C-E). Plaintiff did not co-sign one of the loans Borrower made. (THECB Exs. 2 at ¶ 6a; 2B). Each of the three Promissory Notes Plaintiff co-signed contains the following title: "Hinson-Hazlewood College Student Loan Program Promissory Note for a College Access Loan Administered by the Texas Higher Education Coordinating Board." (THECB Exs. 2C-E).

Each of the three Promissory Notes Plaintiff co-signed includes Terms to which the Borrower agreed. Term A states, *inter alia*, "I understand and agree that this loan is for the specific purpose of pursuing higher education . . . ." (THECB Exs. 2C-E). Provision (1) of Term H (Additional Agreements) states, "The proceeds of this loan will be used only for educational expenses at the school named on my Application and Promissory Note." (THECB Exs. 2C-E). Each of the Promissory Notes Plaintiff co-signed identifies THECB as the Lender and maker of the loan. (THECB Exs. 2 at ¶ 4; 2C-E).

Loan #1 dated July 3, 1991, was not co-signed by Plaintiff.  (THECB Exs. 2 at ¶ 6a; 2A-B).  On Loan #2 dated March 7, 1993, Plaintiff affixed his signature as co-signer and guarantor on February 2, 1993.  (THECB Ex. 2C).  On Loan #3 dated October 8, 1993, Plaintiff affixed his signature as co-signer and guarantor on October 7, 1993.  (THECB Ex. 2D).  On Loan #4 dated November 30, 1994, Plaintiff affixed his signature as co-signer and guarantor on November 29, 1994.  (THECB Ex. 2E).

As part of the Payment Guaranty incorporated in the Promissory Note for Loan #2, Loan #3, and Loan #4, Plaintiff, by his signature, acknowledged he had read all of the terms of the Payment Guaranty and agreed to each of them.  (THECB Exs. 2C-E at ¶ 2).  Plaintiff, by his signature on the Payment Guaranty on Loan #2, Loan #3, and Loan #4, agreed to the following terms:

> This is a guaranty of payment and not of collection. If for any reason other than death or permanent and total disability of Borrower, the adjacent Borrower's Promissory Note is not paid promptly when due, I will immediately pay the source to the Lender, and I waive any right I might have to require that any action be brought against the Borrower.

(THECB Exs. 2C-E at ¶ 3).

Plaintiff's signature on the Payment Guaranty on Loan #2, Loan #3, and Loan #4 affirms his acknowledgement and agreement that each was "in consideration of the extension of the loan referred to in the promissory note for the purpose of assisting in Borrower's education." (THECB Exs. 2C-E at ¶ 1).

THECB's uncontroverted account record for the Borrower lists the PCA number associated with each loan and the respective co-signer for each loan.  (THECB Facts[7] at ¶¶ 14, 15) (THECB Exs. 2 at ¶¶ 3, 5; 2A).  That information is summarized in the following chart:

---

[7] "Facts" denotes the factual assertions contained in Defendant's Motion for Summary Judgment.

| Loan # | Series | Co-signer | Fund | PCA # |
|--------|--------|-----------|------|-------|
| 1 | Series 1991 Revenue Bonds | Not Plaintiff | RBF | 25177 |
| 2 | Series 1992 Bonds | Plaintiff | SLAF | 26826 |
| 3 | Series 1993 Bonds | Plaintiff | SLAF | 28059 |
| 4 | Series 1994 Bonds | Plaintiff | SLAF | 28061 |

Loan #1, not applicable here, has PCA # 25177 and was funded by the RBF. (THECB Facts at ¶¶ 14, 15) (THECB Exs. 2 at ¶¶ 5a, 6a; 2A). Loan #2, co-signed and guaranteed by Plaintiff, has PCA #26826, linking it to the SLAF and Series 1992 Bonds. (THECB Facts at ¶¶ 14, 16) (THECB Exs. 2 at ¶¶ 5b, 6b; 2A). Loan #3, co-signed and guaranteed by Plaintiff, has PCA #28059 linking it to the SLAF and Series 1993 Bonds. (THECB Facts at ¶¶ 14, 17) (THECB Exs. 2 at ¶¶ 5c, 6c; 2A). Loan #4, co-signed and guaranteed by Plaintiff has PCA #28061 linking it to the SLAF and Series 1994 Bonds. (THECB Facts at ¶¶ 14, 18) (THECB Exs. 2 at ¶¶ 5d, 6d; 2A).

## IV.    Condensed History and Background of Federal Student Loan Programs

"The first student loans were created by the National Defense Education Act of 1958 (the "NDEA") which provided fellowships for graduate study and long-term, low-interest loans to needy undergraduates." Somers & Hollis, *Student Loan Discharge Through Bankruptcy*, 4 Am. Bankr. Inst. L. Rev. 457, 457 (1996) (citation omitted). The NDEA was significant because "it was the first broad-based financial aid program and represented a quantum leap in federal involvement in funding higher education." *Id*. at 457-58 (citation omitted).

"A cornerstone of Lyndon Johnson's Great Society was the Higher Education Act of 1965 (HEA)." *Id*. at 458; General Definition of Institution of Higher Education, 20 U.S.C. § 1001 (2012), *et seq*. The HEA contained several key provisions that were the origins of current federal financial aid. *Id*. "The HEA established educational opportunity grants for disadvantaged youths and also expanded the loan program." *Id*. "Aid was awarded to students

in order to increase their access to post-secondary education programs." *Id*. (citation omitted). "Students could use the aid to attend universities, colleges, community colleges, technical schools, and various occupational training programs." *Id*. The HEA included the enactment of the Guaranteed Student Loan Program ("GSLP") which allowed low income students to qualify for student loans. Lemay & Cloud, *Student Debt and the Future of Higher Education*, 34 J.C. & U.L. 79, 80 (2007).

Further expanding the programs, Congress passed the Higher Education Amendments of 1992, which added the Unsubsidized Stafford Program to the GSLP. These expansions to the GSLP have taken form in the Federal Family Education Loan Program ("FFELP"), which now encompasses subsidized and unsubsidized loans; PLUS loans for parents (established in 1981); and loan consolidation. The loans under FFELP are available through lenders that contract with the federal government. The third loan program available to students falls under the Federal Direct Loan Program. This program offers the same loans as the FFELP, but the loans come directly from the federal government and are available only to the neediest students. These programs are all used by the Department of Education ("ED") to provide loans to students who meet the need standards established for each respectively. *Id*. at 80-81 (citations omitted).

There have been additional federal student loan aid programs enacted to assist students for attending college and other post-secondary educations that are not relevant to the Court's analysis. The Court notes that at the time the Plaintiff co-signed the student loans in 1993 and 1994, there had been significant legislation at the federal level regarding student loan financing. The Court recognizes that the loans at issue in this proceeding are State of Texas loans, but the increased level of federal funding for student loans and attendant defaults by student loan borrowers has affected how Congress and the courts have dealt with student loan litigation.

**V.     The Evolution of 11 U.S.C. § 523(a)(8) Through 1998**

Under the Bankruptcy Act of 1898, student loans were dischargeable and treated like other dischargeable unsecured debt. *See* Frank T. Bayuk, Comment, *The Superiority of Partial Student Loans under 11 U.S.C. § 523(a)(8): Ensuring a Meaningful Existence for the Undue Hardship Exception*, 31 Fla. St. U.L. Rev. 1091, 1094 (2004) (citation omitted). Nonetheless, as student loan borrowing and an attendant rise in defaults increased during the twentieth century, there was increased attention as to whether such abuses should be curbed in the bankruptcy context. *Id*. Notably, when the 1973 Congressional Commission on Bankruptcy Laws ("Commission") convened to discuss and propose reforms to the Act of 1898, the Commission noted that professionals were obtaining degrees financed with large amounts of student loan debt and subsequently discharging the debt through bankruptcy. *Id*. Moreover, the Commission found such abuses as a threat to the continuance of education loan programs. *Id*. As a result, the Commission proposed in its Report that, in the absence of undue hardship, student loans would be nondischargeable in bankruptcy unless the first payment due on the note became due more than five years prior to the petition date. *Id*. at 1094 (citation omitted) (there was no empirical evidence available to suggest that there was a wide spread abuse of discharging student loans in bankruptcy, but rather a public perception of abuse).

Congress codified the Commission's proposals in the Education Amendments of 1976. *Id.* at 1095 (citing *Education Amendments of 1976*, Pub L. No. 94-482, § 439A, 90 Stat. 2081, 2141 (repealed 1978)). During the Congressional debate over what became the Bankruptcy Reform Act of 1978, both the Senate and the House debated whether or not to include a provision regarding the nondischargeability of student loan debt. *Id*. Although the House would have made student loans dischargeable, the House ultimately acquiesced to the Senate's proposal

of codifying the Education Amendments of 1976 into the Bankruptcy Code. *Id*. at 1096. In 1990, the "look back" period under § 523(a)(8) was extended to seven years (exclusive of any suspension of repayment period) and Congress altered the original language of § 523(a)(8) to conform the language to the version as it exists today. *Id*. As such, Congress also extended the reach of § 523(a)(8) to include more educational loans. *Id*.

Thereafter, on October 7, 1998, President Clinton signed the Higher Education Amendments of 1998 (the 1998 HEA), which provided federal funding for education loans at a reduced rate of interest. The 1998 HEA also contained two specific changes regarding the collection of student loans. The first relates to § 523(a)(8) and the dischargeability of student loans; and the second, to the enforcement of state court judgments by the federal government for unpaid student loans. Section 971 of the 1998 HEA eliminated the automatic seven-year discharge requirement of § 523(a)(8). In addition, § 484 of the 1998 HEA provides that the United States may register a state court judgment for an unpaid student loan in federal district court by filing a certified copy of the judgment and a copy of the assignment or transfer. As such, the United States no longer needs to file a complaint to secure a separate judgment for an unpaid student loan that has been adjudicated by a state court. The 1998 HEA applies only to cases filed after October 7, 1998, and did not affect pending cases.[8] Congress subsequently amended § 523(a)(8) in 2005 under the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") to apply to private loans as well.

## VI. Was the Plaintiff's Guaranty Dischargeable Under § 528(a)(8) in 1997?

Under the version in effect on August 12, 1997, 11 U.S.C. § 523(a)(8) excepts from discharge debts that are "educational . . . loans made, insured or guaranteed by a governmental

---

[8] Neither party has argued that the temporal requirement of the prior § 523(a)(8) (the look back period of seven years) applies here because as the Court understands the guaranty under the promissory notes, Plaintiff's obligation to pay on the notes arose post-discharge.

unit or nonprofit institution." 11 U.S.C. § 523(a)(8) (1997) (emphasis supplied).[9] The creditor must show: "(1) the existence of a debt; (2) made for an educational loan; and (3) made, insured, or guaranteed by a government unit, or made under any program funded in whole or part by a governmental unit of nonprofit institution." *In re Tollison*, 305 B.R. 656, 659 (Bankr. N.D. Miss. 2004).[10]

As an initial matter, the existence of the debt is undisputed; the Plaintiff signed the guaranty on all three Promissory Notes. Further, the consideration for the debt is contained in the Payment Guaranty. The Promissory Notes also state that the loans are for educational purposes. Additionally, Plaintiff, as the debtor in a Chapter 7 case, listed the debt to THECB on his Schedule "F", and did not indicate that the debt was disputed. The THECB proof of claim, which was not objected to, clearly asserts that the Plaintiff's liability is non-dischargeable. The State of Texas originated the loans from bonds in which the general public invested.

Plaintiff argues that the term "educational loan" is not defined in § 523(a)(8). The Court agrees. Utilizing the premise that the term "educational loan" is somehow ambiguous or undefined, Plaintiff posits that this Court should examine § 523(a)(8)'s legislative history to divine what Congress intended the scope of § 523(a)(8) to be at the time that Plaintiff co-signed

---

[9] 11 U.S.C. § 523(a)(8) (1997). Exceptions to discharge.

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>> (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless — (A) such loan, benefit, scholarship, or stipend overpayment first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; or (B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents[.]

[10] Plaintiff argues that THECB was required to file a complaint to determine the dischargeability of debt under § 523(a)(8). Section 523(a)(8) complaints must be initiated by the debtor, not the creditor. The Plaintiff offers no basis why THECB was required to file a complaint in 1997.

the Promissory Notes. Plaintiff suggests that this Court must determine if Congress intended to apply § 523(a)(8) to state-funded student loans. Plaintiff then cites to a number of authorities that find that consulting legislative history is appropriate to ascertain what Congress intended when it enacted § 523(a)(8). (Pl's Resp.[11] at ¶¶ 41-53). Plaintiff further argues that the State of Texas loans would be private student loans that were not insured or guaranteed by a government agency. Without any indication that Congress considered, debated, or intended to limit the scope of dischargeability to only federal loans, Plaintiff argues that because the precursor to § 523(a)(8) was the HEA of 1965 – which created the GSLP – that Congress, by implication, intended to limit § 523(a)(8) to federal loans. (Pl's Resp. at ¶¶ 50-53). The Court has considered and reviewed the authority in support of these contentions and finds that none of the authorities cited support these conclusions.

Plaintiff cites the Fifth Circuit's opinion in ***In re Murphy***, 282 F.3d 868, 870 (5th Cir. 2002), for the proposition that, because the Fifth Circuit held that an "educational loan" was not limited to just tuition and books under the Federal Family Education Loan Program ("FFELP"), the Fifth Circuit also found that the reason loans under the FFELP were non-dischargeable was because the loans were federally guaranteed loans. (Pl's Resp. at ¶ 45). The Court disagrees with Plaintiff's reasoning. The Fifth Circuit stated in ***Murphy***:

> We conclude that the *text of the Bankruptcy Code*, the Federal Family Education Loan Program ("FFELP"), and *Murphy's promissory notes* support nondischargeability. In other words, *it is the purpose*, not the use, of the loan that controls. Treating FFELP guaranteed loans uniformly, regardless of actual use, is true to the text and will prevent recent graduates from reneging on manageable debts and will preserve the solvency of the student loan system.

***Murphy***, 282 F.3d at 870 (emphasis added).

---

[11] "Pl's Resp." denotes Plaintiff's Response to Defendant THECB's Motion for Summary Judgment (ECF No. 17).

The Court agrees with Plaintiff that the Fifth Circuit did analyze the dischargeability of student loans under the FFLEP; but the Circuit's analysis was not limited to just applying the FFLEP to § 523(a)(8). Rather, the Fifth Circuit explained that the purpose of the loan, not the use, controls to determine whether a student loan expense is dischargeable. In addition, the Court finds persuasive the reasoning of the court in *Karben v. ELSI, et al (In re Karben)*, 201 B.R. 681 (Bankr. S.D.N.Y. 1996), in which the court considered whether § 523(a)(8) applied to the debtor's parents who were the co-signers for the debtor's student loans. In *Karben*, the court held that:

> [A]rguments and assumptions based on legislative history cannot override the legislative intent expressed in the clear words of the statute. The statutory language draws no distinction between obligors on an educational loan. The plain meaning of the statute strongly suggests that educational loans are nondischargeable whether the named borrower is a student or not. Indeed, the exceptions to the nondischargeability of student loans are "carefully delineated in subsections (A) and (B)." *Barth v. Wisconsin Higher Education Corp.* (*In re Barth*), 86 B.R. 146, 149 (Bankr. W.D. Wis.1988). . . . "The policy behind section 523 was to give all educational loans, [sic] special treatment in bankruptcy. Namely, they were excepted from discharge." *Feenstra v. New York State Higher Education Services Corporation* (*In re Feenstra*), 51 B.R. 107, 110 (Bankr. W.D.N.Y. 1985).

*Karben*, 201 B.R. at 683.

The Court recognizes that § 523(a)(8) has been amended several times since 1978 and that the amendments to § 523(a)(8) have further restricted a debtor's ability to discharge student loans. That said, the Court agrees with the Defendant in finding that if the plain meaning of the statute is clear, referencing its legislative history is neither necessary nor proper. *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992) (noting that when a statute is clear on an issue, judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished); *Kentucky Higher Educ. Assistance Auth. v. Norris (In re Norris)*, 239 B.R. 247, 250 (Bankr. M.D. Ala. 1999) ("When interpreting a statute the court must begin,

and often end, with the plain language of the statute."). When a statute's language is plain, "the sole function of the courts is to enforce it according to its terms." *Palmer v. Student Loan Fin. Corp. (In re Palmer)*, 153 B.R. 888, 894 (Bankr. D.S.D. 1993) (citing *Caminetti v. United States*, 242 U.S. 470, 485 (1917)). Section 523(a)(8) does not contain a qualification or limitation that it only applies to federally funded student loans. If Congress had intended such a limitation, Congress could have limited the application of § 523(a)(8) to federally funded student loans by writing that limitation into the statute.

The Third Circuit in *Pelkowski v. Ohio Student Loan Commission, et al (In re Pelkowski)*, 990 F.2d 737 (3rd Cir. 1992), found that a co-obligor on a student loan debt could not discharge her obligation on the basis that § 523(a)(8) did not apply to co-obligors of student loan debt. In reaching its conclusion that § 523(a)(8) applies to co-obligors, the Third Circuit found that the statutory language of § 523(a)(8) makes no distinction based on the status of the borrower as student or as beneficiary of the education. *Id.* at 741. Moreover, the court found that § 523(a)(8) does not refer to a "student debtor" nor does § 523(a)(8) limit a discharge of any debtor from any debt for a covered educational loan. *Id*. The *Pelkowski* court held that, "In the absence of clearly expressed contrary legislative intent, the statutory language must be regarded as conclusive." *Id*. (citations omitted). Like the Plaintiff in this adversary proceeding, the debtor in *Pelkowski* attempted to create ambiguity in the statute by arguing that the statute's silence on co-obligors is an indication that a court must resort to legislative history interpretation. *Id*. at 741-42. The Third Circuit found such reasoning unpersuasive, holding:

> We see no reason to create an ambiguity. If Congress had intended that section 523(a)(8) not apply to non-student co-makers of educational loan debt, we assume that it would have so stated. *See, e.g., Consumer Prod. Safety Comm'n,* 447 U.S. at 109, 100 S. Ct. at 2056.

*Pelkowski*, 990 F.2d at 742.

19

The Third Circuit further held:

> The Supreme Court has cautioned against reading "much into nothing. Congress cannot be expected to specifically address each issue of statutory construction which may arise." *Albernaz v. United States*, 450 U.S. 333, 341, 101 S. Ct. 1137, 1143, 67 L. Ed.2d 275 (1981); *see United States v. Standefer*, 610 F.2d 1076, 1084 (3d Cir.1979) (en banc), *aff'd*, 447 U.S. 10, 100 S. Ct. 1999, 64 L. Ed.2d 689 (1980). In section 523(a)(8), Congress has enacted a provision to except from discharge "any debt ... for an educational loan." The legislative history reveals a clear congressional intent to prevent debtor abuse of the Program and depletion of the Program's resources.

*Pelkowski*, 990 F.2d at 743-44.

The Third Circuit's reasoning is dispositive of Plaintiff's argument that this Court must resort to legislative history to resolve what Congress intended regarding the application of § 523(a)(8) to state funded student loans. Simply put, there is nothing in the legislative history that would require this Court to limit the application of § 523(a)(8) to federally funded student loans.

In addition, the Court notes that several courts have rejected Plaintiff's assertion that Congress intended to limit the scope of § 523(a)(8) to federal loans. As noted in Plaintiff's Motion, prior to 1997, several courts had been applying § 523(a)(8) to state loan programs. *See generally*, *e.g.*, *In re Chisari*, 183 B.R. 963 (Bankr. M.D. Fla. 1995) (Florida Dep't of Education); *In re Halverson*, 189 B.R. 840 (Bankr. N.D. Ala. 1995) (Pennsylvania Higher Education Assistance Agency); *In re Myers*, 150 B.R. 139 (Bankr. W.D. Pa. 1993) (Pennsylvania Higher Education Assistance Agency). While the issue of whether § 523(a)(8) applied to state-funded student loans was not part of these courts' rulings, it is clear that bankruptcy courts have accepted the principle that § 523(a)(8) applies to state-funded student loans.[12]

---

[12] Plaintiff also suggest that this Court should examine the Truth in Lending Act ("TILA") to discern what is meant by a "private education loan." The Court need not engage in this exercise because the TILA has no bearing on this Court's construction of § 523(a)(8).

## VII.    Are the Loans Made, Insured, or Guaranteed by a "Governmental Unit"?

Plaintiff alleges in his Response that the College Access Loans to Ms. Durbin were not made, insured or guaranteed by a governmental unit.  (Pl's Resp. at ¶ 61).  Plaintiff further suggests that there are material issues of fact regarding the status of THECB as a governmental unit.  Additionally, Plaintiff argues that, in administering the Hinson-Hazlewood CAL loan program, the THECB is not performing a governmental function.  (Pl's Resp. at ¶ 64 citing *Muir v. Sallie Mae Servicing Corp., et al* (*In re Muir*), 239 B.R. 213, 217 (Bankr. D. Mont. 1999)).[13]

The Court disagrees with Plaintiff's reasoning.  "An educational loan 'made by' a governmental unit within the meaning of Section 523(a)(8) is one in which a governmental unit is the lender and the holder of the loan obligation.  The particular fund on which the governmental unit draws to fund the loan does not alter the definition." *In re Shore*, 707 F.2d 1337, 1339 (11th Cir. 1983).  THECB is listed on the Promissory Notes as the Lender, and qualifies as a maker of loans under textbook common definitions.  THECB made the College Access Loans to the Borrower using funds from the SLAF.  Moreover, the Bankruptcy Code defines the term "governmental unit" as "United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States […], a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government." § 101(27).  The THECB has conclusively demonstrated that it qualifies as a "governmental unit" under § 101(27).

Plaintiff has not provided competent summary judgment evidence to support his assertion that the College Access Loans were made from "private funds."  (Cmplt. at ¶¶ 80-82).  A review of

---

[13] Plaintiff maintains that *Muir* establishes that a state entity does not qualify as a governmental agency if it is not an "arm of the state."  *Muir*, 239 B.R. at 217.  That is partially correct.  *Muir* holds that for an entity to assert sovereign immunity as a defense to a suit, the affected agency must be an "arm of the state."  *Id*.  Therefore, in *Muir*, the question was whether the debtor could sue a state agency in bankruptcy court where the affected state agency raised a sovereign immunity defense.  The *Muir* court did not find, however, for definitional purposes under the Code, that the lending and guaranteeing of student loan debt by a government agency disqualifies that agency from the definition of a governmental unit under § 101(27).

the Promissory Notes indicates that THECB is listed as the Lender on the Promissory Notes and THECB's representative signed each of the Promissory Notes.  (THECB Exs. 2C-E).  The argument also ignores the THECB's statutory authority to issue bonds and then use the proceeds from the bond sales to make the loans.  Moreover, all the College Access Loans Plaintiff co-signed were funded by general obligation bonds backed by the State of Texas.

In addition to THECB being the maker of the College Access Loans Plaintiff co-signed, it is clear that the CAL debt is guaranteed by a governmental unit. The CAL debt here is for loans that were funded by the State of Texas College Student Loan Bonds, Series 1992, Series 1993, and Series 1994.  The Official Statement for each of these Bond Series states that they "are general obligations of the State of Texas and are issued by the Texas Higher Education Coordinating Board (the "Board"), under the authority of the Constitution and laws of the State of Texas, particularly Chapter 52, Texas Education Code, as amended."  As general obligations of the State of Texas, the loans are guaranteed by the State of Texas, a governmental unit as defined by Bankruptcy Code § 101(27).

In addition to being an educational loan made by a governmental unit, the CAL debt also qualifies as educational loans made under a program funded in whole or in part by a governmental unit.  *See* § 523(a)(8) (1997).  The Plaintiff's Complaint uses the terms 'private' and 'guaranteed' to arrive at contextual meanings of those terms within different statutes.  THECB, through its legislative and constitutional authority, issued bonds that funded the CAL Program loans.  In paragraphs 83-90 of the Complaint, Plaintiff argues that CAL Program loans are not funded by a governmental unit in whole or in part by focusing on the RBF.  The College Access Loans Plaintiff co-signed were not funded by the RBF.  He co-signed three College Access Loans that were funded through the SLAF by general obligation bonds backed by the State of Texas.  Plaintiff fails to recognize that CAL Programs loans are funded through several sources, not exclusively the RBF, and the THECB specifically tracks and segregates the funds associated with each bond issue.  In this case, the Borrower's College Access Loans, tracked by THECB and the Comptroller's Office, are specifically

linked to the SLAF which is funded by proceeds generated by three separate issues of general obligation bonds.

## VIII.    Is the CAL Debt Presumptively Nondischargeable Against Co-signers?

There is no dispute that Plaintiff is not, and never has been, legally related to the Borrower. Plaintiff alleges that § 523(a)(8) does not apply to co-signers on private loans.  The Court has determined that the College Access Loans to Borrower are not private loans.  That said, the question remains – does § 523(a)(8) apply to co-signers who have no filial relationship to the borrower? Plaintiff has cited a number of cases holding that co-signers of federally guaranteed student loans could discharge their obligations related to the student loans because the policy considerations preventing student loans debtors from discharging their student loans and then pursuing lucrative careers does not apply to co-signers.  *See, e.g., Prior v. H&W Recruiting Enter., L.L.C. (In re Prior)*, 243 B.R. 716 (Bankr. W.D. Tenn. 1999) (remaining citations omitted).  Cases that hold to the contrary involved parents or relatives of the debtor co-signing the student loans.  (Pl's Resp. at ¶ 67). The cases that hold parents or relatives liable and unable to discharge their obligations relating to the student loan debts reason that, based upon their family relationship, those co-signers receive some benefit from the student loan program because they did not have to pay for the student's educational expenses out of pocket.  *See, e.g. Educational Res. Inst., Inc. v. Wilcon (In re Wilcon)*, 143 B.R. 4, 5 (D. Mass. 1992) (debtor could not discharge his obligation regarding co-signing son's student loan debt on the basis that debtor was not a student); *Feenstra v. New York Higher Educ. Serv. Corp. (In re Feenstra)*, 51 B.R. 107, 110 (Bankr. W.D.N.Y. 1985) (educational loan signed by parent could not be dischargeable because such a rule would create a loophole and undermine § 523(a)(8)).

Plaintiff further argues that there was a split in authority in 1997 regarding whether co-signers could discharge their student loan obligations.  Plaintiff argues that the critical distinction courts made at that time was whether the co-signer was a relative of the debtor who received a benefit by not paying for the student's education.  Plaintiff maintains that there are not any reported

cases involving unrelated co-signers of student loans. That said, Plaintiff suggests that when Congress amended § 523(a)(8) under BAPCPA to specifically include private loans and Section 221 of the Internal Revenue Code ("I.R.C.") (which applies only to the taxpayer, taxpayer's spouse, and dependent of the spouse) to add "qualified educational loans" as nondischargeable, Congress demonstrated an intent not to include co-signed student loans by non-relatives. Plaintiff argues that by referencing § 221 of the I.R.C., which does not include non-relatives of the student loan borrower, Congress evidenced its intent not to include co-signers, such as Corletta, to nondischargeability provisions.

In paragraphs 47-58 of the Complaint, Plaintiff asserts that the CAL debt was discharged because Debtor was a co-signer with no legal relationship to the Borrower. The fact that Debtor was not a relative of the Borrower does not change the definition of co-signer under the state statute regulating the Hinson-Hazlewood Student Loan Program. A co-signer may, but is not required to be, a relative. As a co-signer, Plaintiff is liable for the repayment of the Borrower's educational loans. More importantly, the plain reading of § 523(a)(8) does not discharge the CAL debt just because the Debtor is a co-signer. The prevailing case law in this Circuit has determined that the obligation speaks to the loan, not the person. *See, e.g.*, ***Mackey v. Neb. Student Loan Program (In re Mackey)***, 153 B.R. 34, 35 (Bankr. N.D. Tex. 1993); ***Educ. Res. Instit. Inc. v. Varma, (In re Varma)***, 149 B.R. 817, 818 (N.D. Tex. 1992) (finding the purpose of § 523(a)(8) is "the loan, not the beneficiary of the education"). Notably, "the statute does not refer to 'student debtors' but limits the discharge of any 'individual debtor' for 'any debt' for covered educational loans." ***Mackey***, 153 B.R. at 35 (citing ***Pelkowski***, 990 F.2d at 741; ***In re Hawkins***, 139 B.R. 651, 652-53 (Bankr. N.D. Ohio 1991)) (reviewing legislative history to find the literal language of § 523(a)(8) excepts from discharge the educational loan obligation irrespective of the obligor). The ***Pelkowski*** court recognized that the statutory language of § 523(a)(8) makes no distinction based on the status of the borrower as

24

student or as beneficiary of the education. *Id*. at 741. Moreover, the court found that § 523(a)(8) does not refer to a "student debtor" nor does § 523(a)(8) limit a discharge of any debtor from any debt for a covered educational loan. *Id*. Further, the **Pelkowski** court held, "In the absence of clearly expressed contrary legislative intent, the statutory language must be regarded as conclusive." *Id*. (citations omitted).

Under the statute, the general rule is that educational loans are not dischargeable. § 523(a)(8). Two exceptions are provided. One, if the loan first became due more than seven years before the bankruptcy petition was filed; and two, if enforcement would result in undue hardship. That Plaintiff was not the recipient of the funds and was not the student are not stated as exceptions to nondischargeability. This is strong evidence that Congress was not concerned with the nature of the debtor but, rather, was concerned with the nature of the debt. In other words, Congress determined that certain exceptions to the nondischargeability of educational loans were appropriate but chose not to include the exceptions suggested by Plaintiff. *See In re Koeppen*, 1991 WL 544026, *2 (Bankr. D. Or. Oct. 29, 1991) (Under the plain meaning of § 523(a)(8), wife as co-signer of husband's student loans, may not discharge her obligation. There is no exception in the statute for co-obligors).

<h2 style="text-align:center">CONCLUSION</h2>

IT IS THEREFORE, ORDERED that Defendant's Motion for Summary Judgment is hereby GRANTED. It is further,

ORDERED, that the CAL debt Plaintiff owes to the THECB is deemed a nondischargeable debt under 11 U.S.C. § 523(a)(8) (1997). It is further,

ORDERED, that the CAL debt was not discharged by the Discharge Order in Plaintiff's 1997 Chapter 7 bankruptcy. It is further,

ORDERED, that Defendant THECB's Counterclaim contained in Paragraph 129 of its Answer (ECF No. 4) is resolved as a consequence of this Court's Grant of Summary Judgment. It is further,

ORDERED, that the Plaintiff's Complaint is hereby DISMISSED WITH PREJUDICE and all relief to the Plaintiff is DENIED.  It is further,

ORDERED, that Defendant THECB may make application for attorneys' fees within fourteen (14) days pursuant to Fed. R. Bankr. P. 7054 and Local Rule 7054.

###